# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

## 06-1041

**STATE OF LOUISIANA,**
**IN THE INTEREST OF D.H. AND E.G.F.**

**VERSUS**

**A.E.F.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, DOCKET NO. J-1434-03
HONORABLE VERNON B. CLARK, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**SYLVIA R. COOKS**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks and Elizabeth A. Pickett, Judges.

**AFFIRMED;**
**MOTION TO WITHDRAW GRANTED.**

Robert J. Elliott
Department of Social Services
P.O. Box 832
Alexandria, Louisiana 71309
(318) 487-5218
COUNSEL FOR APPELLEE:
    State of Louisiana

D. Wayne Bush
S. Christie Smith, IV
The Smith Law Firm, LLP
300 Courthouse Street
P.O. Drawer 1528
Leesville, Louisiana 71496
(337) 239-2244
COUNSEL FOR APPELLANT:
    A.E.F.

**COOKS, Judge.**

## STATEMENT OF THE CASE

A.E.F. appeals the judgment of the trial court terminating her parental rights based on La.Ch.C. art. 1051(5). Her attorney filed a motion on appeal to withdraw as counsel of record. For the reasons assigned below, we affirm the decision of the trial court terminating A.E.F.'s parental rights. We grant the motion of S. Christie Smith, IV to withdraw as counsel for A.E.F

## STATEMENT OF THE FACTS

A.E.F. is the mother of D.H., age six and E.G.F., age four. The events leading to the termination of A.E.F.'s parental rights began in November 2003 when an investigation was initiated by the Department of Social Services, Office of Community Services of Vernon Parish, concerning a report of alleged sexual abuse of D.H., then age three, by her stepfather. The child was examined by a physician and the Department requested a meeting with D.H.'s mother to discuss the alleged incident. When the mother failed to appear as requested, considering the seriousness of the allegations, the Department began to inquire as to her whereabouts. She and her two children were eventually located by the Rapides Parish Sheriff's Department in the home of an individual who operated a methamphetamine lab. When she was discovered by deputies, A.E.F. was in the process of cooking methamphetamines. A.E.F. was arrested and jailed. On November 26, 2003, an Instanter Order was issued removing the children from the custody of their mother and placing them in the temporary custody of the State of Louisiana (State). Thereafter, the children were adjudicated children in need of care and D.H. was placed in a foster home.

The State developed several case plans for the children with input from all

interested parties including A.E.F.[1] The initial goal was reunification of D.H. with her mother. However, because there was no substantial compliance by A.E.F. with the case plans submitted by the State, and considering the fact that D.H. had been in foster care for two years, the State filed a petition for termination of parental rights on October 19,2005. Following a hearing, the trial court terminated A.E.F.'s parental rights. We have reviewed the testimony of the witnesses presented at the hearing and find no error in the judgment of the trial court.

## LAW AND DISCUSSION

The grounds for termination of parental rights are provided for in La.Ch.Code art. 1015(5) which provides, in relevant part:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

The intervention of the State in the parent/child relationship is only justified under serious circumstances. In order to sever the legal relationship between parent and child, the State has an onerous burden of proof. The State must establish each element of the grounds for termination of the parental relationship by clear and convincing evidence. *State ex rel. D.R.B.* 00-1321 (La.App. 3 Cir. 12/6/00), 777 So.2d 508. In an involuntary termination proceeding, there are two interests at stake - those of the child and those of the parent. However, "[i]n balancing the parents' and the child's interests, the courts of this state have consistently found the interests of

---

[1] Upon investigation A.E.F. revealed her son's legal father was not his biological father. DNA testing confirmed J.P. was the biological father of E.G.F. J.P. has custody of his son and therefore E.G.F.'s placement is not an issue in this proceeding. D.H.'s biological father did not appeal the decision of the trial court terminating his parental rights.

the child . . . [is] paramount over those of the parents." *State ex rel. L.B. v. G.B.B.*, 02-1715, p. 4 (La. 12/4/02), 831 So.2d 918, 921. The Louisiana Supreme Court explained:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated.(Citations omitted.) As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.

*State ex rel. J.A.,* 99-2905, pp. 8-9, (La. 1/12/00), 752 So.2d 806, 811.

The child, D.H., was three when the State obtained an Instanter Order removing her from A.E.F.'s custody and placing her in foster care. Her foster family, the Dauzats, seek to adopt her. During the two year interim, the State prepared several case plans, which were approved by the court, with the goal of reunification. A case plan assessment, prepared shortly after the children were removed, reflect A.E.F.'s pattern of behavior with regard to D.H. The reports states, in part:

> Mrs. F. visited with the children twice weekly since the last FTC until January 29. She was out of contact with the office from January 29-February 19. No family members seemed to know where she was. On February 19, she contacted the worker and asked to visit with the children, stating that she has been psychiatrically hospitalized in Lafayette. She failed to produce any documentation of this hospitalization and subsequently did not appear for the February 23 Adjudication Hearing. She has not been in contact with this office since February 19. Reports from law enforcement indicate that she has missed other court hearing[s] and there are warrants for her from Leesville City Police; and Vernon, Rapides, and Lafayette Parish Sheriff's offices. Mrs. F. has completed none of her case plan[s] other than the visits described above.
> . . . .
>
> Mrs. F. has made no progress on her case plan. Psychological

4

evaluation shows that she will need very long term treatment and her prognosis is very poor.

Sharon Lewis, a child counselor with the Allen Parish Mental Health Clinic, testified at the hearing. Ms. Lewis held a team conference and presented a case plan to A.E.F. with the goal of unification. D.H.'s father was incarcerated and did not attend. Another conference was called several months later to discuss A.E.F.'s noncompliance. Ms. Lewis' records reflect A.E.F. attended only eleven of the thirty-eight scheduled visits with her child and was out of contact with the agency for six months in 2004. A.E.F. began substance abuse evaluations, but failed to make follow-up appointments. Ms. Lewis stated when she left the agency, Ila Cook took over A.E.F.'s case.

Ms. Cook testified she had limited contact with both parents in the fall of 2004. She scheduled a team conference in October 2004 to discuss a case plan. However, neither parent attended because both were back in jail. A.E.F. was subsequently released but in late January 2005, she was again incarcerated on a drug conviction. D.H.'s father was also incarcerated. During this time, Ms. Cook requested home studies on several family members, but there were no family members willing to take D.H. or the home was rejected as a possible placement. Ms. Cook testified both parents were in and out of jail during the time she handled the case file. The last case plan was prepared by Ms. Cook in October 2005. The goal was changed from reunification to adoption.

Dr. John Simoneaux, a licensed psychologist, testified at trial. He saw A.E.F. on two occasions and conducted clinical interviews, personality testing and a mental status exam. In the first examination, he found A.E.F. had a very serious drug problem and would need very long-term treatment. Dr. Simoneaux found "she was irresponsible, immature and deceptive. . . . she told me things that contradicted herself

5

and contradicted other reports, minimized her drug problems. . . .she clearly had serious problems, that her judgment was deplorable and there had been no apparent improvement from the time the children were removed because at - by the time I saw her she was in terrible shape." Dr. Simoneaux testified A.E.F. had "no insight into the concerns regarding parenting. . . .I suggested therapy, but I thought it was going to be very, very long-term and I said the prognosis would be very poor." During the second evaluation, Dr. Simoneaux indicated he saw some change, but concluded: "I thought it was primarily due to the fact that she had been in jail. . . . because, of course, she didn't have access to drugs. I said her need for substance abuse treatment was still 'profound', was the word I used. Personality problems were still very evident." With the level of drug use involved, Dr. Simoneaux stated A.E.F. would need a complete lifestyle change and a lifetime commitment to sobriety which, realistically, he did not see happening in the future.

Terri Theaux, a licensed professional counselor with the Psychology Clinic in DeRidder, was called to testify. When allegations of sexual abuse occurred, D.H. was brought to Ms. Theaux for counseling. In the course of her treatment of the child, she saw A.E.F. Ms. Theaux described an early visit with A.E.F., as follows:

> I had one in particular in 2004 that I was very concerned about. It was - [A.] had probably been released from an incarceration maybe a day or two. That first went okay. The second one I was really concerned about [A.] She was full of bruises and marks. Her eyes were glazed over. Her speech was slurred. She indicated to me that she had taken Loritab for a back problem and that the person that she was staying was probably not the best person for her to be around and I was really concerned for her safety.
> . . . .
> Well, it was difficult for her to attend to the child and I had to encourage the child to come near her mother to engage in an activity with her, one that I chose to structure so that the child would be safe and she was very reluctant to do that at first but she did warm up to her.

During the time Ms. Theaux was counseling D.H., A.E.F. was again jailed on drug

6

related charges. D. H. knew her mother was in jail and expressed fear of going to visit her in that setting. Consequently, Ms. Theaux had to arrange to have A.E.F. transported for visits with her child. Ms. Theaux testified when D.H. was initially evaluated there were substantial difficulties with her behavior. She would hit and kick her younger brother. She was aggressive, had nightmares, would scream for hours, and throw temper tantrums. "She was inconsolable, couldn't stop her crying, became hysterical, would resist even the most simple of commands. . . . There were problems with bowel control. She would wet the bed and she was basically just very, very anxious and miserable." Since being placed with the Dauzat family Ms. Theaux testified her behavior has dramatically improved. When questioned as to reasons for the change in her behavior, Ms. Theaux stated:

> Her stability and predictability of life. She gets up at a certain time, goes to school, knows when she's coming home, knows who is going to drop her off, pick her up, is told in advance of doctors appointments and therapy appointment, just – her life is very orderly and predictable for her and we know that young children who have a very predictable lifestyle that they tend to adjust quite well and do very well and I believe that really has contributed to her stability.
> . . . .
> I believe at this point in her life that the Dauzats are really her psychological parents. That she has bonded with them.
> . . . .
> I think the reunification issue has certainly been complicated by – as previously noted, her drug use and her frequent incarcerations. I don't have a date of when this current stint will end. The child is five and a half, will be six in October of this year.
> . . . .
> I think she's an anxious enough child she needs for that to be settled so that she can have a sense of direction and a sense of belonging. . . . She has some future direction and plans and some hopes in her life and, and she's really in a, in a good place right now.

A.E.F. testified at the hearing. She was twenty-six years old and was currently in the Simmesport Correctional Facility for possession of cocaine. She had been in jail for seventeen months. While in prison, A.E.F. stated she attended parenting, anger management, AA, NA, life skills and freedom classes. She had contacted

Claire House, a half-way house for mothers and their children. She believes she will be paroled in September 2006 and, if released, plans to seek residency in Claire House with her child, D.H. However, Oliver Michael Medina, an officer with the Department of Public Safety and Corrections, Division of Probation and Parole, stated her full-term release date is not until March 2010 and she has been convicted of a probation violation and there is another probation violation pending. Additionally, D.H.'s counselor, Ms. Theaux, was specifically questioned about whether a half-way house setting would be beneficial for D.H. She responded:

> I think the child has made so much progress in foster care and in the Dauzat home that I think there are potentially more risk to her if she were to be removed from that home and placed in the setting that you and I are discussing. I think potentially there, there is harm to the child.

In reviewing the testimony, we find there was no substantial compliance with the case plan for reunification by A.E.F. from the time the instanter order was issued until the time of trial. Prior to her second incarceration she made no effort to improve her situation or seek treatment for her drug dependency. It was only after she was incarcerated the last time that she expressed an interest in changing her life. D.H. was only three when she was placed in foster care and was experiencing severe emotional trauma. Since that time the Dauzat family has provided a stable, secure environment for her and they seek to adopt her. We find the State has carried its burden of proving there is no reasonable expectation of significant improvement in the A.E.F.'s condition or conduct in the near future. We conclude, considering the child's age and her need for a safe, stable, and permanent home, the best interest of D.H. is served by terminating the parental rights of A.E.F. and releasing her for adoption. Therefore, we affirm the decision of the trial court.

**DECREE**

Based on the foregoing review of the record, we affirm the decision of the trial court termination the parental rights of A.E.F.  We grant the motion of S. Christie Smith IV to withdraw as counsel of record.

**AFFIRMED;**
**MOTION TO WITHDRAW GRANTED.**